108 F.3d 1123
 RICO Bus.Disp.Guide 9237, 97 Cal. Daily Op. Serv. 1800,
97 Daily Journal D.A.R. 3382
 John NEIBEL; Nancy Neibel; Laureen Perkins; Michael
Perkins; Rhonda Foston; Frances Foston; Bernard Foston;
James Harding; Richard Kerrigan; Charlene McLean; Roy
Phillips; Arthur Yancey; Marilyn Dupree; Dennis Layton;
Allen Layton; Kathleen O'Docharty; David O'Docharty; John
Core; Delilah Core; Gary Strand; Richard Rose; Elbert
Ferguson; C.J. Bartyzel; Joseph Ransom; Becky Bochman;
Bruce Bochman; Shirley Kent; Plaintiffs-Appellees,
v.
TRANS WORLD ASSURANCE COMPANY, Defendant-Appellant.
 Nos. 95-16149, 95-16748.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 10, 1996.
Submission Withdrawn Dec. 13, 1996.
Resubmitted Feb. 5, 1997.
Decided March 11, 1997.
 
 Sandra J. Smith and Barry R. Levy, Horvitz & Levy, Encino, California, for the defendant-appellant.
 William H. Blessing, Cincinnati, Ohio, Iris W. Fein of Fein & Jakab, New York City, for the plaintiffs-appellees.
 Appeals from the United States District Court for the Northern District of California; Charles A. Legge, District Judge, Presiding, D.C. No. CV-91-02316-CAL.
 Before: GOODWIN, WALLACE, and RYMER, Circuit Judges.
 OPINION
 WALLACE, Circuit Judge:
 
 
 1
 Trans World Assurance (Trans World) appeals from a judgment following a jury trial in favor of John Neibel and twenty-one other plaintiff-appellees (Neibel) for violations of 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act (RICO), common law fraud, and negligent misrepresentation. Trans World also challenges the jury's state law punitive damage award, as well as the district court's award of attorney's fees and related expenses under 18 U.S.C. § 1964(c). The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291, and we affirm.
 
 
 2
 * This is not the first time that a tax scheme of Donald Fletcher and a conspiring insurance company has graced the pages of the Federal Reporter. See Davis v. Mutual Life Ins. Co. of New York, 6 F.3d 367 (6th Cir.1993), cert. denied, 510 U.S. 1193, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994); Hofstetter v. Fletcher, 905 F.2d 897 (6th Cir.1988). Each time, the facts remain remarkably consistent.
 
 
 3
 Fletcher and his associates, who operated under the auspices of "Fletcher Insurance Associates" (FIA), preyed on what he called "Joe Lunch Buckets"--middle class Americans with little experience with the tax laws or the legal system. At his tax seminars, Fletcher promised those in attendance, like Neibel, that they could lawfully reduce their income tax liability to zero by taking home-based business deductions under the Internal Revenue Code. Fletcher's program would provide tax return preparation and advice, future legal protection against Internal Revenue Service (IRS) audits, and insurance benefits to the client-investors who joined.
 
 
 4
 Yet there were several catches to this "tried and true" scheme. To enroll in Fletcher's plan, a client had to (1) run a home-based business, like Amway; (2) record every family expenditure; (3) turn over all tax records and affairs to Fletcher and his associates; and most importantly, (4) buy the life insurance policies specified by Fletcher, which in this case belonged to Trans World. Fletcher "freed up" money for a client to purchase the insurance policy by preparing new W-4 tax forms, which increased the number of withholding allowances and thus reduced tax liability. Insurance companies (here, Trans World) would automatically withdraw this "extra" money from the client's checking account to pay for the insurance policy.
 
 
 5
 Impressed with Fletcher's sales of other insurance companies' policies, Trans World executive Charles Royals hired Fletcher in September 1981 and immediately appointed him a general agent with Trans World. This position gave Fletcher the authority to hire, train, and fire Trans World agents. Trans World also named Fletcher as its "Marketing Director" on that same day. Both positions were independent contractor positions. Fletcher and FIA did good business for Trans World and quickly became one of Trans World's top agencies. Fletcher's tax scheme brought millions of dollars in sales to Trans World. Royals urged Fletcher to "keep up the good work with the seminars. You're doing great." Royals attended one of Fletcher's seminars as a featured guest and was introduced to the audience as Trans World's president. Royals even shook hands and spoke with those in attendance. Royals also attended a meeting at FIA's office in San Carlos, California, and was overheard discussing Fletcher's scheme and "how they were going to make money" from FIA. Royals, as Trans World's president, was fully aware of the nature of Fletcher's scheme and approved of it: "I have no problem with you changing W-4 forms. It's done all the time." Fletcher described Trans World's support for his scheme: "[Trans World is] one-hundred percent behind us" and "we're all talking the same language."
 
 
 6
 Unfortunately for Fletcher's and Trans World's clients, the scheme raised the suspicions of the IRS, which began auditing the returns of Trans World's clients who purchased insurance policies through Fletcher's program. Despite FIA's promise that "nobody had ever lost a dime" under its scheme, these audits eventually led to Fletcher's and Trans World's clients incurring severe IRS penalties for late payments and overstated deductions. In May 1986, Trans World received a letter from Michael Florez, an attorney, that detailed Fletcher's "tax shelter sham" and its impact on Trans World's clients. Trans World rejected Florez's offer to provide more information and continued to sign up policyholders through Fletcher's scheme. In January 1987, Trans World was served with a summons and complaint for a federal suit in Ohio arising from Trans World's relationship with Fletcher's tax scheme. Trans World did not timely respond to this complaint and continued to use FIA agents to sell its insurance policies. In March 1987, Trans World received the second service of summons for the Ohio litigation, yet still continued to sell policies through Fletcher's scheme.
 
 
 7
 By the late 1980's, Trans World faced several lawsuits arising from its association with FIA. In 1990, Royals ordered the destruction of microfilm records in Trans World's San Mateo headquarters, which contained the sales records of FIA agents. Trans World's Pensacola administrative office also destroyed its microfilm records. Although Royals claimed this destruction was standard operating procedure, Trans World's principal office secretary of ten years, Marti Groves, testified that the destruction of microfilm records was not business as usual.
 
 
 8
 At a jury trial, Neibel alleged that Trans World and Mutual Life Insurance Company of New York (Mutual) violated 18 U.S.C. § 1962(c)-(d). Neibel also alleged several state law claims, including fraud and negligent misrepresentation, and requested state law punitive damages. Mutual settled out of court with Neibel before trial. After Neibel finished presenting evidence, Trans World moved for a directed verdict. The district court granted Trans World's motion on the section 1962(c) claim, concluding that Neibel failed to establish that Trans World participated directly or indirectly in the conduct of FIA's affairs. The district court denied the motion as to the remaining claims, and the jury found Trans World liable for violating section 1962(d), awarding Neibel $259,366 in actual damages (trebled to $778,098 under 18 U.S.C. § 1964(c)). It also awarded Neibel $87,000 in damages for fraud and negligent misrepresentation. Finally, the jury awarded $500,000 in punitive damages under California Civil Code § 3294. After trial, the court awarded Neibel $472,066 in attorneys' fees and $49,496.24 in costs under section 1964(c) of RICO.
 
 II
 
 9
 Trans World first argues that the district court's directed verdict on the section 1962(c) claim prevents Neibel from succeeding on the section 1962(d) claim. We review interpretations of RICO de novo. Ticor Title Ins. Co. v. Florida, 937 F.2d 447, 450 (9th Cir.1991). Section 1962(c) of RICO states:
 
 
 10
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 
 
 11
 18 U.S.C. § 1962(c). Section 1962(d) states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).
 
 
 12
 Trans World cites Religious Technology Center v. Wollersheim, 971 F.2d 364, 367 n. 8 (9th Cir.1992), and contends that since the district court entered a directed verdict on the substantive claim (section 1962(c)), then the conspiracy claim (section 1962(d)) to violate section 1962(c) cannot stand. Yet Religious Technology Center stands for a wholly different proposition. In that case, we held that since the plaintiff "failed to allege the requisite substantive elements of RICO, the conspiracy cause of action cannot stand." Id. In other words, if the section 1962(c) claim does not state an action upon which relief could ever be granted, regardless of the evidence, then the section 1962(d) claim cannot be entertained. That proposition differs from the facts of this case, where the trial court granted a directed verdict on the 1962(c) claim due to a lack of evidence. A lack of evidence may render the substantive claim deficient, but it does not render it legally impossible.
 
 
 13
 We have never considered directly whether a civil conspiracy claim can survive if the substantive claim does not. In United States v. Ohlson, 552 F.2d 1347, 1349 (9th Cir.1977), we held that in a criminal RICO proceeding, the crime of conspiracy could exist independently of the substantive offense. Since the Ninth Circuit generally treats criminal and civil RICO claims alike, Chang v. Chen, 80 F.3d 1293, 1297 n. 1 (9th Cir.1996), we hold that a section 1962(d) claim may proceed to a jury despite a directed verdict on the section 1962(c) claim. This holding brings our court in line with the Seventh Circuit, which allowed a section 1962(d) claim to reach the jury even though the trial court granted a directed verdict on the section 1962(c) claim. See Gagan v. American Cablevision, 77 F.3d 951, 961, 964 (7th Cir.1996).
 
 III
 
 14
 Trans World next contends that there was insufficient evidence for the jury to find that Trans World violated section 1962(d). We review whether "substantial evidence" supported the jury's verdict, or "such relevant evidence as reasonable minds might accept as adequate to support a conclusion." Murray v. Laborers Union Local No. 324, 55 F.3d 1445, 1452 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1847, 134 L.Ed.2d 948 (1996).
 
 
 15
 In Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (Reves ), the Supreme Court clarified what evidence was necessary to establish a section 1962(c) violation:
 
 
 16
 In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.
 
 
 17
 ....
 
 
 18
 ... An enterprise also might be "operated" or "managed" by others "associated with" the enterprise who exert control over it....
 
 
 19
 Id. at 179, 184, 113 S.Ct. at 1170, 1173 (footnote omitted).
 
 
 20
 Our case involves section 1962(d), or the conspiracy to violate section 1962(c). Several circuits have grappled with the impact of Reves on section 1962(d), with varying results. See United States v. Castro, 89 F.3d 1443, 1452 (11th Cir.1996) ("[T]he Reves 'operation or management' test does not apply to section 1962(d) convictions."), cert. denied, --- U.S. ----, 117 S.Ct. 965, 136 L.Ed.2d 850 (1997); United States v. Antar, 53 F.3d 568, 581 (3d Cir.1995) (Antar ); United States v. Quintanilla, 2 F.3d 1469, 1485 (7th Cir.1993) ("[Reves ] did not address the principles of conspiracy law undergirding § 1962(d)."). After reviewing all of these cases, we believe that the Third Circuit's Antar opinion best comports with our post-Reves case law. In Antar, the court examined section 1962(d) in light of Reves and concluded:
 
 
 21
 [W]e believe that a distinction can be drawn between, on the one hand, conspiring to operate or manage an enterprise, and, on the other, conspiring with someone who is operating or managing the enterprise. Liability under section 1962(d) would be permissible under the first scenario, but, without more, not under the second. This is because in the former situation, the defendant is conspiring to do something for which, if the act was completed successfully, he or she would be liable under section 1962(c). But in the latter scenario, the defendant is not conspiring to do something for which he or she could be held liable under the substantive clause of the statute. Therefore, liability should not attach.
 
 
 22
 Antar, 53 F.3d at 581 (footnote omitted).
 
 
 23
 We have defined conspiracy in the RICO context as "an agreement to conduct or participate in the affairs of an enterprise and an agreement to the commission of at least two predicate acts." Baumer v. Pachl, 8 F.3d 1341, 1346 (9th Cir.1993), quoting United States v. Neapolitan, 791 F.2d 489, 499 (7th Cir.), cert. denied, 479 U.S. 939 & 940, 107 S.Ct. 421 & 422, 93 L.Ed.2d 371 & 372 (1986). We agree with the Third Circuit that to uphold the jury's verdict in this case after Reves, there must have been substantial evidence that Trans World agreed to have "some part in directing [FIA's] affairs." Reves, 507 U.S. at 179, 113 S.Ct. at 1170. Evidence that Trans World knew of FIA's scheme, benefitted from the scheme, or even conspired with Fletcher to violate the tax code would not be enough to impose RICO liability.
 
 
 24
 Applying the Antar test to our case is no easy task. Royals, as President of Trans World, clearly knew what FIA was doing. He attended Fletcher's tax seminars and chatted with those in attendance. He even approved of the alteration of W-4 forms to "free up" cash to purchase Trans World insurance policies. Yet was there substantial evidence of Trans World's agreement to exert control over FIA? We conclude that there was.
 
 
 25
 The key piece of evidence is the testimony of Annette Gormley, who said that she overheard Royals and Fletcher discuss in FIA's San Carlos, California office "how they were going to make money" on Fletcher's tax scheme. Since this meeting occurred in FIA's office and featured both Fletcher and Royals discussing the tax scheme and how they would profit from it, the jury could reasonably infer that Royals and Fletcher were planning the future actions of FIA, and that Trans World therefore agreed to have "some part in directing [FIA's] affairs." Id.
 
 
 26
 Ample circumstantial evidence bolsters the jury's finding: Trans World hired Fletcher's agents as independent contractors to sell policies; Royals appeared at a FIA tax seminar; Royals approved of Fletcher's W-4 tax form scheme; Fletcher proclaimed that Trans World was "one-hundred percent behind" FIA, and that they were "talking the same language"; and Trans World, deviating from standard policy, destroyed microfilm records while litigation was pending. This circumstantial evidence, when viewed in light of Royals's statement in the FIA office, sufficiently supports the theory that Trans World agreed to have "some part in directing [FIA's] affairs." Id. Thus, substantial evidence existed to support the jury's verdict.
 
 IV
 
 27
 Trans World next argues that the district court erred in refusing to instruct the jury that "[a] corporation cannot conspire with its agents." "We review for abuse of discretion a district court's formulation of civil jury instructions." Fikes v. Cleghorn, 47 F.3d 1011, 1013 (9th Cir.1995).
 
 
 28
 Subsequent to the jury's verdict, we held that "[section] 1962(d) applies to intracorporate conspiracies." Webster v. Omnitrition Int'l, 79 F.3d 776, 787 (9th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 174, 136 L.Ed.2d 115 (1996). Therefore, the trial court did not abuse its discretion in rejecting the proposed instruction.
 
 V
 
 29
 Trans World next contends that the district court erred in not giving its "Bateman " instruction to the jury. Trans World asserts that Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), should extend to civil RICO actions. The Court in Bateman held:
 
 
 30
 [A] private action for damages [under the federal securities laws] may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public.
 
 
 31
 Id. at 310-11, 105 S.Ct. at 2629.
 
 
 32
 We need not decide whether Bateman should apply to RICO actions, because Trans World's proposed instructions failed to articulate the Bateman test. Trans World's proposed instructions stated in part:
 
 
 33
 Trans World contends that the plaintiffs were involved in tax evasion and that their claims are barred by this illegal conduct.
 
 
 34
 An illegal agreement is unenforceable. Neither party to an illegal agreement is entitled to relief and the parties are to be left in the position they were in when the action was filed.
 
 
 35
 ....
 
 
 36
 An agreement to evade taxes by improperly claiming a deduction is illegal and unenforceable by either party to it.
 
 
 37
 ....
 
 
 38
 No one can take advantage of his own wrongdoing.
 
 
 39
 ....
 
 
 40
 If you find that a plaintiff entered into an agreement to evade taxes or willfully attempted to evade taxes, then your verdict should be for Trans World and against that plaintiff on each claim.
 
 
 41
 Trans World's instructions, at best, describe an "unclean hands" defense, for they speak of the illegality of tax evasion. They do not reflect the "equal involvement" requirement of Bateman. Also, the instructions ignore the "significantly interfere with the effective enforcement" requirement of Bateman. Since Trans World's proposed instructions fail to state essential elements of a Bateman defense, the trial court did not abuse its discretion by refusing to give the instructions to the jury.
 
 VI
 
 42
 Trans World next asserts that the district court erred by not offsetting from the jury award a settlement reached between five plaintiffs and Mutual. These five plaintiffs bought policies from both Trans World and Mutual. In essence, Trans World argues that since Mutual settled with these five plaintiffs for more than their actual damages, the plaintiffs lack the standing to sue Trans World for RICO damages, for they have already been compensated fully for their losses.
 
 
 43
 At trial, Trans World strenuously argued that it did not act jointly with Mutual. The trial court agreed, finding that there was "no evidence ... of any conspiracy linking [Mutual] to [Trans World]." This is a finding of fact, which we review for clear error. Campbell v. Wood, 18 F.3d 662, 681 (9th Cir.) (en banc), cert. denied, 511 U.S. 1119, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994). After reviewing the record, we conclude that the trial court did not clearly err in this finding.
 
 
 44
 Now on appeal, Trans World argues that the district court should have offset the Mutual settlement from the jury's award because it duplicated the plaintiffs' recovery. Yet at trial, Trans World successfully argued that it acted subsequently to, and not in concert with, Mutual. Since Trans World did not act jointly with Mutual, Trans World offers no reason to offset the Mutual settlement from the jury's award; the Mutual settlement and the Trans World damage award arose from completely separate events. Trans World successfully argued at trial that Mutual acted independently, and it is bound by that success.
 
 VII
 
 45
 Trans World next argues that the trial court erred in permitting Neibel to receive both treble and punitive damages. It cites Southwest Marine v. Triple A Machine Shop, 720 F.Supp. 805, 810 (N.D.Cal.1989), to suggest that a court cannot award both punitive and RICO treble damages. Southwest Marine held only that punitive damages were unavailable directly through RICO. It did not hold that RICO barred a plaintiff from receiving punitive damages under state law. Any discussion beyond this in Southwest Marine is dicta.
 
 
 46
 It is probably true that statutory treble damages are punitive, see Browning-Ferris Industries v. Kelco Disposal, 492 U.S. 257, 274-75, 109 S.Ct. 2909, 2919-20, 106 L.Ed.2d 219 (1989), and two circuits have held in the antitrust context that a plaintiff cannot receive both treble antitrust damages and state law punitive damages from the same "course of conduct." See Fineman v. Armstrong World Industries, 980 F.2d 171, 218 (3d Cir.1992), cert. denied, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); SuperTurf, Inc. v. Monsanto Co., 660 F.2d 1275, 1283 (8th Cir.1981). Trans World asks us to extend the logic of the antitrust cases to RICO damage awards.
 
 
 47
 Taken out of context, we do not doubt the persuasiveness of Trans World's arguments, but we cannot ignore the text of RICO itself, which states: "Nothing in this title shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this title." Pub.L. No. 91-452, § 904(b), 84 Stat. 941, 947 (1970) (emphasis added). The Supreme Court has interpreted this section to mean that "under RICO, the States, remain free to exercise their police powers to the fullest constitutional extent in defining and prosecuting crimes within their respective jurisdictions." United States v. Turkette, 452 U.S. 576, 586 n. 9, 101 S.Ct. 2524, 2530 n. 9, 69 L.Ed.2d 246 (1981); cf. United States v. Baker, 63 F.3d 1478, 1494 (9th Cir.1995) (upholding convictions to violate both RICO and the Contraband Cigarette Trafficking Act even though they were "multiplicitous"), cert. denied, 516 U.S. 1097 & ----, 116 S.Ct. 824 & 921, 133 L.Ed.2d 767 & 850 (1996); United States v. Deshaw, 974 F.2d 667, 671-72 (5th Cir.1992) ("RICO's statutory language reflects congressional intent to supplement, rather than supplant, existing crimes and penalties."). The wording of the statute convinces us that the same reasoning should apply to civil as well as criminal cases. Since Congress has spoken clearly on this issue, we are bound by its wishes. We hold that a plaintiff may receive both treble damages under RICO and state law punitive damages for the same course of conduct.
 
 VIII
 
 48
 We leave the statutory argument and turn now to the constitutional challenge. Trans World argues that the Fourteenth Amendment prohibits state law punitive damages in this case because they are "grossly excessive" under BMW of North America v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In BMW, Gore discovered that BMW had failed to disclose that his automobile had been repainted due to damage during delivery. A jury awarded Gore $4,000 in compensatory damages, and $4,000,000 in punitive damages. The Alabama Supreme Court reduced the punitive award to $2,000,000. Id. at ---- - ----, 116 S.Ct. at 1593-95.
 
 A.
 
 49
 The United States Supreme Court first concluded that a State "does not have the power ... to punish [a defendant] for conduct that was lawful where it occurred and that had no impact on [the State] or its residents." Id. at ----, 116 S.Ct. at 1597. In this case, it is unlikely that Trans World's deceptive and fraudulent acts would be legal in any American jurisdiction. Also, since Trans World's principal place of business and office are in California and Trans World's relevant tortious activities occurred in California, we are confident that this punitive award was "supported by [California's] interest in protecting its own consumers and its own economy." Id. We conclude that the punitive award in this case satisfies the "State's interest" test of BMW. We need not decide whether the jury should have been given a specific instruction on the issue. See Continental Trend Resources v. OXY USA, 101 F.3d 634, 637-38 (10th Cir.1996) (Continental Trend Resources ). It is clear that only California interests are involved.
 
 B.
 
 50
 Next, the Court reasoned in BMW that "a person [must] receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." 517 U.S. at ----, 116 S.Ct. at 1598. California Civil Code § 3294(a) clearly indicates that fraud can warrant an award of punitive damages: "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Trans World had "fair notice" of the possibility of punitive damages for its fraudulent actions.
 
 
 51
 When determining if a defendant lacked "fair notice" of the severity of a punitive damages award, BMW sets forth three "guideposts" to evaluate if a punitive damages award was "grossly excessive": "the degree of reprehensibility" of the tortious act; "the disparity between the harm or potential harm suffered" by a plaintiff and "his punitive damages award"; and "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." Id. at ---- - ----, 116 S.Ct. at 1598-99. We analyze each of these "guideposts" in turn.
 
 1.
 
 52
 As the Supreme Court said in BMW: "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Id. at ----, 116 S.Ct. at 1599. In BMW, the Court concluded that BMW's repainting of the car was not "particularly reprehensible" because the damage was purely economic, id., and there was no evidence that BMW "engaged in prohibited conduct while knowing or suspecting that it was unlawful." Id.
 
 
 53
 The same cannot be said for Trans World. Its tortious behavior constituted more than hiding minor damage during delivery; this behavior led to the financial ruin of many of the plaintiffs. Trans World's actions also led to emotional distress and mental anguish, as several witnesses testified. A paint job could not hide the damage that Trans World inflicted on the lives of Neibel and the others. As the Court said in BMW: "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." Id. (citation omitted). Since Trans World preyed on "Joe Lunch Buckets," its actions were clearly "reprehensible."
 
 
 54
 Also, Trans World had ample notice of the illegality of Fletcher's scheme. Not only did prior insurance companies run into trouble due to their association with Fletcher, but Trans World received several warnings that Fletcher's scheme was nothing more than a "tax shelter scam." Yet Trans World continued to reap the benefits from its conspiracy with FIA, and agreed to lure more "Joe Lunch Buckets" into the scheme. Trans World's activities were "particularly reprehensible conduct." Id.
 
 2.
 
 55
 "The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." Id. at ----, 116 S.Ct. at 1601. Our "inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." Id. at ----, 116 S.Ct. at 1602 (citations and quotation marks omitted). In other words, does the ratio between punitive damages and actual damages " 'raise a suspicious judicial eyebrow?' " Id. at ----, 116 S.Ct. at 1603, quoting TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 482, 113 S.Ct. 2711, 2732, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting). In BMW, the ratio of punitive damages to compensatory damages was 500 to 1. If we consider the actual damages in this case to be the state law fraud and negligent misrepresentation award of $87,000, the ratio of punitive damages to actual damages is $500,000 to $87,000, or approximately 6 to 1. While no "simple mathematical formula" automatically controls this case, id. at ----, 116 S.Ct. at 1602, this ratio does not "raise [our] suspicious judicial eyebrow," id. at ----, 116 S.Ct. at 1603, nor does it approach the staggering 500 to 1 ratio of BMW. See also Continental Trend Resources, 101 F.3d at 639 ("From [BMW ] we surmise that in economic injury cases if the damages are significant and the injury not hard to detect, the ratio of punitive damages to the harm generally cannot exceed a ten to one ratio.").
 
 3.
 
 56
 "Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." BMW, 517 U.S. at ----, 116 S.Ct. at 1603. In this case, state and federal criminal sanctions potentially existed for Trans World's transgressions. See Cal.Penal Code § 182(a)(4) (prohibiting the conspiracy "[t]o obtain money ... by false promises with fraudulent intent not to perform such promises."); Cal.Penal Code § 484 ("Every person ... who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money ... is guilty of theft."); Cal.Ins.Code § 781 ("A person shall not make any misrepresentation ... to any other person for the purpose of inducing, or tending to induce, such other person ... to take out a policy of insurance."); 18 U.S.C. § 1963(a) ("Whoever violates any provision of section 1962 of [RICO] shall be fined under this title or imprisoned not more than 20 years ... or both...."). The Court in Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23, 111 S.Ct. 1032, 1046, 113 L.Ed.2d 1 (1991), focused on the importance of criminal penalties when making this comparison, and the Court in BMW cited this proposition. See BMW, 517 U.S. at ----, 116 S.Ct. at 1603. Since severe criminal penalties potentially existed for Trans World's actions in this case, this "guidepost," along with the other two, dictates that the punitive damages award in this case is not "grossly excessive" under BMW, and thus does not offend the Fourteenth Amendment.
 
 IX
 
 57
 Finally, Trans World argues that since "the judgment on the RICO claim cannot stand," this court must reverse the district court's order awarding attorney's fees and costs under section 1964(c). Trans World offers no other reason either to reverse or reduce the award.
 
 
 58
 "We review a district court's award of attorney's fees and costs for an abuse of discretion." Schwarz v. Secretary of Health & Human Services, 73 F.3d 895, 900 (9th Cir.1995). Since the section 1962(d) claim is sound, the district court did not abuse its discretion in awarding both attorney's fees and costs under section 1964(c).
 
 
 59
 AFFIRMED.
 
 
 60
 RYMER, Circuit Judge, concurring in part and dissenting in part:
 
 
 61
 I join the majority's opinion except for its application of the Reves/ Antar standard in Part III, since I can't conclude on the facts before us that there was any evidence that Trans World conspired to participate in FIA's management or operation.
 
 
 62
 As Judge Wallace observes, this is a difficult case under the Reves/ Antar standard, which requires proof that Trans World conspired "to operate or manage an enterprise." Reves v. Ernst & Young, 507 U.S. 170, 185, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993) (stating that the standard for violating § 1962(c) is "participat[ion] in the operation or management of the enterprise itself"); United States v. Antar, 53 F.3d 568, 581 (3d Cir.1995) (setting the standard for conspiring to violate § 1962(c)). The majority concludes that there was circumstantial evidence that Trans World agreed to participate in operating the Fletcher enterprise in that Royals knew what FIA was doing, attended Fletcher's tax seminars, approved altering the W-4 forms, told Fletcher that they would all "make money," paid commissions to Fletcher's insurance agents, and appeared to encourage Fletcher's activities. I part company because to me, these facts amount at most to an agreement to do something wrong--not to an agreement to violate § 1962(c) by operating or managing FIA.
 
 
 63
 Neibel alleged, and the district court found, that FIA was the RICO enterprise. Neibel therefore had to prove that Trans World, which was in the business of selling insurance through agents, agreed or conspired to step outside that business and to take some part in directing FIA's affairs. The district court ruled that the evidence could not, as a matter of law, show that Trans World in fact played any part in operating or managing the enterprise in violation of § 1962(c), and Neibel hasn't cross-appealed that ruling.
 
 
 64
 Although the district court's ruling that Trans World did not violate § 1962(c) does not defeat Neibel's conspiracy claim as a matter of law, as a practical matter it makes it virtually impossible to prove in this case for there is no evidence of an inchoate conspiracy. Viewed most charitably to the verdict, the evidence shows that Trans World knew and approved of what FIA was doing, and benefitted financially from it because it was able to sell insurance. Without question, this supports an inference that Trans World agreed with Fletcher that FIA should operate as it did, so that both companies could profit from the fraud. And from this, the jury could reasonably conclude that Trans World "conspir[ed] with someone [Fletcher] who [was] operating or managing the enterprise." See Antar, 53 F.3d at 581. But that is not enough under the Third Circuit's test that we adopt. Rather, Neibel had to show that Trans World "conspir[ed] to operate or manage an enterprise" itself. Id. In other words, he had to show that Trans World agreed "to do something for which, if the act [were] completed successfully, [it] would be liable under section 1962(c)," id., that is, that while Trans World did not participate in operating or managing FIA, it conspired or agreed to do so.
 
 
 65
 As I read the record, Neibel failed because there is no evidence that Trans World had any interest in running FIA. It sold insurance and was happy to do so to FIA's victims. Yet nothing suggests that Trans World agreed with Fletcher or anyone else to take over, wholly or in part, the "operation or management" of the enterprise, FIA.
 
 
 66
 Absent a showing that Trans World agreed with someone to operate or manage FIA itself, it was "not conspiring to do something for which [it] could be held liable under the substantive clause of the statute. Therefore, liability should not attach," id., and I would reverse the verdict for Neibel.