In the
United States Court of Appeals
For the Seventh Circuit

No. 98-3760

United States OF AMERICA,

Plaintiff-Appellee,

v.
Gregory Swan,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 97 CR 105-3--Charles R. Norgle, Sr., Judge.

Argued December 10, 1999--Decided August 10,
2000
Amended April 25, 2001

  Before Easterbrook, Rovner, and Diane P.
Wood, Circuit Judges.

  Diane P. Wood, Circuit Judge.  From 1987 until 1994, Gregory Swan worked for the City of Chicago. During the last two years of that period, his specific job was for 13th Ward Alderman John Madrzyk. Unfortunately for the City, neither Madrzyk nor Swan had its best interests at heart. This case is Swan's appeal from his convictions for participating in a racketeering conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), mail fraud, theft of funds, extortion, money laundering, obstructing the IRS, failing to file tax returns, and using a false social security card. The district court sentenced him to five years' imprisonment on counts 1 (racketeering), 2 (racketeering conspiracy), 5 and 6 (theft of funds), 7 and 14 (extortion), and 8 (money laundering). He received 12 months on counts 3 and 4 (mail fraud), 9 (obstructing the IRS), 10, 12, and 13 (failure to file tax returns), and 15 and 16 (use of a false Social Security card). All counts were to run concurrently with

each other. In addition, the court ordered three years of supervised release and ordered Swan to pay $100,000 in restitution.

Swan's appeal challenges the jury instructions used to convict him on the RICO count; the sufficiency of the evidence against him for conviction on the RICO charges and the mail fraud charges; and the district court's admission of evidence of his gambling and failure to complete work that others had hired and paid him for. We affirm all but Swan's conviction on count 1.

I

Swan and Madrzyk cheated the City in a number of ways. The two of them created four "ghost jobs" enabling Swan, his son (Greg Swan), his girlfriend (Sharon Nova), and another friend (David Sipich) to receive paychecks and benefits from the City of Chicago without doing any actual work. Madrzyk received a kickback from each of the ill-gotten paychecks. Swan and Madrzyk also referred people and companies who came to Madrzyk seeking City assistance such as rezoning and inspection help to Swan's "consulting" firm. These people then paid a "consulting fee" to the firm, notwithstanding the fact that neither Swan, the firm, nor Madrzyk did anything more for them than the Alderman was required to do as part of his position. Swan attempted to cover up these schemes by failing to report his income from the ghost jobs and the consulting fees to the IRS. By 1994, as Swan became more desperate, he lied to federal agents about the sources of his income and began to use false social security numbers for various purposes. He also stopped using bank accounts in a desperate effort to eliminate the paper trail related to his income, and he used other people as intermediaries for his illegal gains.

II

Eventually, of course, federal authorities caught up with him and brought the charges now before us. Swan, Madrzyk, and two others were charged in a superseding indictment with violations of 18 U.S.C. sec.sec. 1962(c) (RICO), 1962(d) (RICO conspiracy), 1341 (mail fraud), 1951 (extortion), 1956 (money

laundering), 666 (theft of funds), and 2 (aiding and abetting various counts), as well as 26 U.S.C. sec.sec. 7212 (obstructing the IRS) and 7203 (failure to file tax returns) and 42 U.S.C. sec. 408 (use of a false Social Security card). (Madrzyk eventually pleaded guilty and testified against Swan under a grant of immunity.) To violate RICO sec. 1962(c), a person employed by or associated with an enterprise that is engaged in, or that conducts activities that affect interstate or foreign commerce, must conduct or participate, directly or indirectly, in the conduct of that enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. In order to have conducted or participated in the enterprise's affairs under section 1962(c), the person charged must have had "some part in directing those affairs." Reves v. Ernst & Young, 507 U.S. 170, 179 (1993). In other words, she must have participated in the operation or management of the enterprise itself. See id. at 183; Goren v. New Vision Int'l. Inc., 156 F.3d 721, 727-28 (7th Cir. 1998). Reves also held that "[a]n enterprise might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it . . . ." 507 U.S. at 184.

   Overlooking this requirement of control (perhaps mistakenly relying on pre-Reves jurisprudence), the government insisted upon and the court permitted the following jury instruction on count 1:

The terms "conduct" and "participate in the conduct of the affairs of the enterprise" include the performance of acts, functions or duties which are necessary to or helpful in the operation of the enterprise.

There was no additional instruction requiring a finding of operation or management of the enterprise. The court gave that instruction over Swan's objection. Swan both objected and asked the court to instruct the jury that the simple giving of directions and performance of tasks necessary or helpful to the organization, without more, was insufficient. The court rejected his position because it thought that Reves applied only to civil RICO prosecutions and thus that Swan's proposed instruction

did not correctly state the law.

We review the trial court's jury instructions with deference, analyzing them as a whole to determine if theyaccurately state the law. See United States v. Kelly, 167 F.3d 1176, 1178 (7th Cir. 1999). Even if we find that a jury instruction was erroneous, we will reverse only if we believe that the instruction confused the jury and therefore prejudiced the defendant. See id. at 1179.

In this case, it is plain that the RICO jury instruction was deficient. We reiterate: "simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under sec. 1962(c)." Goren, 156 F.3d at 728. The instruction the court gave could not have given the jury any idea that it needed to find that Swan participated in the management or operation of the enterprise.

The government argues that any error in the instruction was harmless and thus does not justify reversal. While we have no problem with the general proposition that harmless error analysis applies to jury instructions, see Neder v. United States, 527 U.S. 1, 18 (1999), we do not agree that this particular error could be called harmless. To affirm the RICO conviction here, we would have to find that it was "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." Id.; see also Lanier v. U.S., 205 F.3d 958, 964 (7th Cir. 2000). That we find impossible to do on this record. It is true that the jury found Swan guilty of conspiring to violate sec. 1962(c) when it convicted him on the charge in count 2 of violating 18 U.S.C. sec. 1962(d). But this did not supply the missing finding relating to participation in the management or operation of the enterprise--a finding that the jury had no need to make under the court's instruction--for the simple reason that a sec. 1962(d) conspiracy conviction does not require the jury to find that the defendant was an operator or manager of the enterprise. See Brouwer v. Raffensperger, 199 F.3d 961, 967 (7th Cir. 2000). To convict Swan on count 2, the jury needed only to find that he

knowingly agreed to facilitate the activities of those operators or managers to whom sec. 1962(c) can apply (such as someone like Madrzyk). See id. And the facts established by the record (that Swan received a ghost payroll check, took on clients referred to him by Alderman Madrzyk, failed to file tax returns, and used a false Social Security card) do not prove that he managed or operated the "enterprise" (which here was apparently the City of Chicago itself). Because the record does not contain overwhelming evidence that Swan managed or operated the enterprise, and because the jury was not fully informed as to the elements of a RICO violation, we reverse Swan's conviction on count 1.

This conclusion, we note, however, will have no effect on the amount of time Swan spends in prison, even though it will entitle him to a modest adjustment of the special assessment he must pay. Count 1 was grouped, for sentencing purposes, with counts 2, 5-6, and 8-16 under U.S.S.G. sec. 3D1.2. The offense level determined for the group depended not on count 1, but on count 8, money laundering, because U.S.S.G. sec. 3D1.3 provides that the offense level for the group is derived from the count with the highest offense level, which was money laundering at an offense level of 25. The total combined offense level is therefore not affected by reversal of the RICO charge.

III

Swan argues next that there was insufficient evidence to convict him of violating either the racketeering or the mail fraud counts. Because we are reversing his sec. 1962(c) conviction on other grounds, we address only the sufficiency of the evidence to support his mail fraud conviction. As we constantly observe, the governing standard of review makes success on such a claim exceedingly hard. We must draw all reasonable inferences in favor of the government, and we affirm if any rational fact finder could have determined that Swan was guilty beyond a reasonable doubt. See United States v. Yoon, 128 F.3d 515, 523 (7th Cir. 1997).

A mail fraud violation occurs when someone "for the purpose of executing [a]

scheme or artifice [to defraud] or attempting . . . to do [so]," places in the mails something to be delivered by a mail carrier. 18 U.S.C. sec. 1341; see United States v. Keane, 522 F.2d 534, 551 (7th Cir. 1975). Swan's conviction rests on his use of the mails to defraud the Hinsdale Orthopedic Association. Around December 13, 1994, Blue Cross/Blue Shield mailed a check for $171 to Hinsdale Orthopedics to reimburse it for the medical services it rendered to Nova, Swan's girlfriend. Swan had a hand in this mailing because he helped procure the "ghost" job for Nova that provided her with the Blue Cross/Blue Shield insurance policy. Swan did not have to mail the check himself to be guilty of mail fraud. He only needed to cause it to be mailed or to commit some act that would cause the mailing of the check to be reasonably foreseeable. See Keane, 522 F.2d at 551. When Swan got Nova the ghost job, which came with pay and benefits, it became reasonably foreseeable that Blue Cross/Blue Shield would reimburse medical institutions for her care.

Swan claims that the check was not mailed "for the purpose of executing [the fraud]," as sec. 1341 requires. He points out that United States v. Maze, 414 U.S. 395, 402 (1974) held that mail fraud charges were not supported where the evidence showed that reimbursement checks had been mailed by banks to hotels after the defendant had already used stolen credit cards to obtain services from the hotels. But the point of Maze was that the defendant had already completed the fraud when he left the hotels. Whether or not the banks actually paid the hotel bills did not affect the defendant. Here, in contrast, the Blue Cross/Blue Shield check served an important purpose in furthering the fraud: without the check, the fraud would have been frustrated, because Hinsdale would simply have turned to Nova for payment. Nova would not have received fraudulently obtained medical services for free. She remained personally liable for the services she had received until the bill was paid by someone. The evidence of the Blue Cross/Blue Shield mailing was sufficient to form the basis for Swan's mail fraud conviction.

IV

Swan's final quarrel is with the district court's decision to allow the government to present evidence of his gambling and of his failure to perform consulting services as promised. We review the trial court's evidentiary decisions for abuse of discretion. See United States v. Garcia, 986 F.2d 1135, 1139 (7th Cir. 1993).

Normally, evidence of prior bad acts is not admissible to show character traits and conformity with those traits. See Fed. R. Evid. 404(b). Such evidence is nonetheless admissible where (1) it is relevant to establish some matter in issue other than the defendant's propensity to commit the crime, (2) it shows that the defendant actually committed the prior bad acts, and (3) its probative value is not substantially out weighed by the danger of unfair prejudice. See Fed. R. Evid. Rules 404(b), 403; United States v. Asher, 178 F.3d 486, 492 (7th Cir. 1999). The government argued that the evidence here was necessary to fill out the witnesses' stories so that they would make sense to the jury (see, e.g., United States v. Gill, 58 F.3d 334, 337 (7th Cir. 1995)), and that the evidence helped to explain Swan's intent and motive to commit the crimes. We do not find these grounds persuasive. This is not a case like United States v. Mobley, 193 F.3d 492 (7th Cir. 1999), in which the prosecution was allowed to introduce evidence of gambling because the defense made the question of cash flow relevant. Here, the references to Swan's gambling were gratuitous. None of Swan's fraudulent activity was inextricably related to his gambling or failure to perform contractual duties. Witnesses could have explained their relationships with Swan without mentioning that they met him while gambling, and they could have discussed their giving Swan money for services without adding that in the end he did not follow through. Moreover, the fact that Swan gambled did little to explain why he wanted to steal money. Most people want money for a variety of reasons, and the government did not attempt to show any special circumstances such as a large gambling debt hanging over Swan's head that would have provided him with a particularly weighty motive to steal. The fact that Swan did not perform services for some clients may evidence

intent to extort, but his actual taking of their money, also introduced into evidence, proved that intent. The non-performance of the services added little or nothing.

Even though the admission of the evidence was probably error under Rules 404 and 403 of the Federal Rules of Evidence, we think it clear on this record that any error was harmless. See Garcia, 986 F.2d at 1139. The victims of Swan's extortion testified against him; several witnesses testified that Swan set up the ghost jobs and paid Madrzyk kickbacks; and Madrzyk himself took the stand to testify against Swan. There was overwhelming evidence that Swan was part of a RICO conspiracy, and committed the fraudulent acts with which he was charged.

V

In sum, we Affirm all of Swan's convictions with the single exception of the conviction under Count 1, which we Reverse. The case is Remanded to the district court for correction of the sentence and the special assessment inaccordance with this opinion.