# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 00-3719, 00-3720, 00-3721, 00-3731, 00-3740, 00-3865, 00-4344, 00-4345 & 01-1683

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CARL J. WARNEKE, DAVID KADLEC, LESLIE J. JENSEN, ROBERT A. KRUPPSTADT, RANDALL E. MILLER, RICHARD E. MROCH, KEVIN P. O'NEILL, HARVEY E. POWERS, and JAMES W. SCHNEIDER,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 97-CR-98—**J.P. Stadtmueller**, *Judge.*

———————

ARGUED OCTOBER 17, 2002—DECIDED NOVEMBER 12, 2002

———————

Before EASTERBROOK, MANION, and KANNE, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Warfare broke out between the Outlaws and Hell's Angels motorcycle gangs during the 1990s when the Angels began to establish a presence in the Midwest by absorbing the Hell's Henchmen, another motorcycle "club." The conflict seems to have been more about control of criminal activities (such as drug sales) than about divergent methods of motorcycle maintenance or incompati-

ble bikes (both groups favor Harleys). The record in this criminal prosecution establishes that members of the Outlaws used murderous force to ward off the threat, and the Angels replied in kind. Outlaws preferred sneak attacks (using bombs) to open ones but were not averse to other weapons. The Outlaws acquired and used at least one AK-47 assault rifle, along with many other guns. An elderly couple with no connections to either group is among the dead, and three police officers were injured when a bomb exploded as it was being dismantled.

A grand jury charged that the Outlaws were a criminal "enterprise" that the nine defendants operated through a pattern of racketeering (including shootings, bombings, robbery, drug sales, and passing counterfeit money), violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68. James Schneider pleaded guilty and was sentenced to 45 years in prison. The other eight went to trial and were convicted. Five of the eight were sentenced to life imprisonment; the rest received long terms of years. The evidence against each of these eight is overwhelming, and we do not discuss individual challenges to its sufficiency. Nor does the defendants' complaint about trying seven of them together (a last-minute problem with counsel led the judge to give Harvey Powers a separate trial) require analysis beyond a citation to *Zafiro v. United States*, 506 U.S. 534 (1993), and the observation that the judge did not abuse his discretion.

Considerable evidence came from transmitters inside lamps in the homes of Outlaws Kevin O'Neill and David Wolf. A warrant authorized agents to hear and record the communications. Nonetheless, defendants contend, the evidence should have been suppressed because not only installation of the bugs but also a determination that one was functional preceded issuance of the warrant—and the judge was not told that these things had occurred.

Neither the installation of the bugs nor the receipt of a signal from one violated the fourth amendment: the former because the Constitution does not protect criminals against the risk that their associates will assist the police, see *Hoffa v. United States*, 385 U.S. 293, 300-03, 310-12 (1966), and the latter because the agents did not intercept any communication prematurely. It is the private information, not knowledge that a device is working, that the fourth amendment safeguards. See *United States v. Karo*, 468 U.S. 705 (1984). Placement of these microphones was the result of good police work plus luck. The informant was Patricia Wolf, David's wife, who set up two lamps, one containing a microphone. Visiting the Wolf home, O'Neill said that he liked the lamps. Patricia then swapped the inactive lamp for a second bugged lamp. When O'Neill repeated his admiration of the lamps and asked if he could have one, Patricia graciously assented. O'Neill took one of the lamps (it did not matter which) and thus bugged his own home. But he didn't plug it in, and without electricity it was useless. So Patricia Wolf paid O'Neill's girlfriend a friendly visit and helped her improve the lighting in O'Neill's office. Agents drove by O'Neill's residence to find out if this worked; they learned from detecting a carrier signal that it had. Only then did they seek a warrant; only after obtaining the warrant did they listen to any conversation. Because the agents did not intercept any communications until after the warrant had issued, installation of the devices (and determination that they were live) did not violate statutory limits on eavesdropping; until listening began, the bugs were nothing but "tracking devices" under 18 U.S.C. §3117(b). See also 18 U.S.C. §2510(12).

We may suppose (without deciding) that when seeking authorization to listen to conversations the agents should have told the judge that the lamps were already in place, but this does not matter. It is not conceivable that the judge would have said anything like: "Because you used an

informant to install one microphone and tricked O'Neill into bugging his own home, I will deny you permission to listen even though you have established probable cause to believe that the bugs will reveal evidence of crime." Cf. *Franks v. Delaware*, 438 U.S. 154 (1978). Perhaps the judge would not have authorized clandestine entry had he realized that bugs already were in place. Prosecutors say that they sought authority to enter in case the lamps should be unplugged or not transmit signals strong enough to be recorded; the judge might have required prosecutors to show one of these problems before authorizing an entry. But in the event no entry was made. So there is no causal chain from the omission to any evidence used against the defendants, and no basis for suppression.

Defendants press several objections to their RICO convictions. One that affects all defendants is a contention that conspiracies may not be included among the predicate racketeering offenses. Defendants contend first that no inchoate offense can be "racketeering activity" as 18 U.S.C. §1961(1)(A) defines that term, and second that use of conspiracy as a predicate is particularly inappropriate when the federal crime is a RICO conspiracy violating §1962(d). (They also contend that there was one big underlying conspiracy, for at most one predicate offense, rather than multiple conspiracies with different criminal objects. This presented a jury question, resolved adversely to defendants at trial on the basis of ample evidence. We do not discuss this theme further.) Objections to the use of conspiracies as predicate crimes have been made in other circuits, uniformly without success. See *United States v. Ruggiero*, 726 F.2d 913, 918-20 (2d Cir. 1984); *United States v. Manzella*, 782 F.2d 533, 537-38 (5th Cir. 1986); *United States v. Licavoli*, 725 F.2d 1040, 1044-45 (6th Cir. 1984). We agree with these decisions.

Section 1961(1)(A) defines "racketeering activity" to include "any act or threat involving murder, kidnapping,

gambling, arson, robbery, bribery, extortion, dealing in ob-scene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year". The indictment listed 34 predicate acts of racketeering activity, some of which were (or included) conspiracies to do one or more of these things—for though the Outlaws carried out many malevolent acts, sometimes their plans went awry and only inchoate crimes could be proven. It is no stretch to describe a plot to blow up a Hell's Henchmen clubhouse (with members inside) as an "act or threat involving murder . . . which is chargeable under State law and pun-ishable by imprisonment for more than one year". Conspir-acy means agreement, and agreement is an "act" rather than just a thought. Conspiracies are illegal because of what they portend (that is, what the conspirators threaten to do). What is more, all of the state-law conspiracies listed as predicate offenses depend on proof of overt acts—con-crete steps toward the substantive crime, steps that them-selves qualify as predicate offenses. The prosecutor did not charge as predicate offenses any conspiracy that may be established without proof of an overt act—such as a drug conspiracy under federal law, see *United States v. Shabani*, 513 U.S. 10 (1994).

There's no reason to distinguish the substantive RICO of-fense under §1962(a), (b), or (c) from a RICO conspiracy un-der §1962(d) when it comes to use of inchoate offenses as predicates. The definition in §1961(1)(A) does not vary with the choice of subsection in §1962. See *United States v. Neapolitan*, 791 F.2d 489, 501 (7th Cir. 1986). True enough, we held in *United States v. Baker*, 905 F.2d 1100 (7th Cir. 1990), that a drug conspiracy may not be used as a predi-cate offense for purposes of the Continuing Criminal Enter-prise statute, 21 U.S.C. §848. But this was because any drug conspiracy would be a lesser included offense of the

crime defined by §848. By contrast, a conspiracy to commit murder is not a lesser included offense of the RICO crime, which is defined as operating or managing an enterprise through a pattern of racketeering activity. It is possible to manage an enterprise without killing anyone (or conspiring to do this), so using a conspiracy as a predicate offense does not entail double counting.

Powers offers a wrinkle on these arguments. He starts from the fact that §1962(c) makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity". In order to "conduct or participate" in the enterprise, one must have "some part in directing" its affairs. See *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993); *United States v. Swan*, 250 F.3d 495, 498-99 (7th Cir. 2001). Yet the conspiracy charge under §1962(d) did not require the jury to find that Powers had directed, managed, or otherwise conducted the enterprise. Relying on *Neibel v. Trans World Assurance Co.*, 108 F.3d 1123, 1128-29 (9th Cir. 1997), Powers insists that only a person who participates in an enterprise's management or operation may be guilty of conspiracy under §1962(d). And although Powers was convicted of a substantive RICO offense, he contends that the jury instructions for this crime were incorrect so that the jury did not necessarily find that he managed or conducted any of the Outlaws' operations.

*Neibel* is an unsatisfactory decision. It assumes that only a person who has committed the substantive crime can be guilty of conspiracy and then holds that this principle applies to RICO too. Yet there is no such principle. As cases such as *Standefer v. United States*, 447 U.S. 10 (1980), and *United States v. Pino-Perez*, 870 F.2d 1230 (7th Cir. 1989) (en banc), show, one may be a conspirator or aider and abetter even if one cannot be convicted as a principal. Example: a person can conspire to distribute drugs without actually

distributing drugs, indeed without ever having acquired drugs to distribute. One may commit the crime of conspiracy even though it is impossible to perform all of the acts constituting the substantive offense. See, e.g., *United States v. Feola*, 420 U.S. 671, 694 (1975); *Hyde v. United States*, 225 U.S. 347, 365 (1912). "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense". *Salinas v. United States*, 522 U.S. 52, 65 (1997). But this requirement will be met whenever the conspirator joins forces with someone *else* who manages or operates the enterprise. Section 1962(d) is not limited to a conspiracy among the top dogs. So we held in *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000), and reiterated in *Swan*, 250 F.3d at 499. Nothing in *Neibel* persuades us to change course. Indeed, the ninth circuit seems not to have recognized that it was going against the Supreme Court's view of what is necessary to prove a criminal conspiracy. It claimed to be following *United States v. Antar*, 53 F.3d 568 (3d Cir. 1995), and *United States v. Quintanilla*, 2 F.3d 1469 (7th Cir. 1993), but *Quintanilla* has nothing to do with this subject, and the third circuit has disavowed the passage in *Antar* to which *Neibel* referred, and disagreed with *Neibel*'s holding too. See *Smith v. Berg*, 247 F.3d 532, 536-38 (3d Cir. 2001). Every other circuit that has considered this subject likewise has disapproved *Neibel*. See *United States v. Zichettello*, 208 F.3d 72, 98-99 (2d Cir. 2000); *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998). See also *United States v. Starrett*, 55 F.3d 1525, 1547 (11th Cir. 1995) (a pre-*Neibel* RICO prosecution of other Outlaws in which the court held that the RICO conspiracy offense does not require proof that the defendant operated or managed the enterprise). We shall stick with *Brouwer*.

As for the jury instructions in Powers's trial concerning the substantive RICO offense: The judge told the jury that

[a] person "conducts or participates in the conduct of the affairs of an enterprise" if that person uses his position in, or association with, the enterprise to perform acts *which are involved in some way in* the operation or management of the enterprise, directly or indirectly, or if the person causes another to do so.

According to Powers, the language we have italicized waters down the statutory requirement that the person "conduct" or "participate in" the operation or management of the enterprise. Under the instruction given, for example, a secretary who types a letter for a manager might violate §1962(c) even though the letter had nothing to do with any predicate offense, because sending letters is "involved in some way" in the operation or management of the business. *Reves* and *Swan* hold that to violate RICO the person must have a real operational (or managerial) role, while the italicized language sweeps up peripheral figures.

This is a good point in principle. It would be better for a district judge to use language of the kind suggested in *Swan*, or just use the statutory language. Section 1962(c) declares that it is "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through" a pattern of specified predicate acts. The phrase "directly or indirectly" already contains enough flex that the addition of phrases such as "involved in some way" may move jurors too far from the law itself. The terms in the statute are not abstruse legalisms; attempts at elaboration may not improve the accuracy of decisions. But the language the district judge used does not vitiate the conviction, because other parts of the instructions made it clear that only those who personally carry out the "pattern of racketeering activity" may be convicted. Secretaries, lamp dealers, and other peripheral figures who might be swept in by the phrase "involved in some way" are swept

right out again by the racketeering-activity element. There was no risk that a harmless functionary would be convicted under the full set of instructions given to Powers's jury, and the evidence was ample to show that Powers "conducted" the affairs of his chapter of the Outlaws through a pattern of bombings, shootings, and other violence, for which he was awarded a special commendation that he wore openly, proclaiming his role as an enforcer. (Powers wore a patch bearing a skull and crossed pistons, with an "SS" insignia awarded only to members who had committed acts of violence on the group's behalf. After becoming a full member of the Outlaws in fall 1994, and receiving the SS insignia for his role in killing LaMonte Mathias, Powers committed several additional murderous acts and participated in other criminal activities to boot.)

Defendants individually and collectively make a passel of additional arguments. Powers, for example, wanted more time so that his new lawyer could work through the voluminous record. Yet counsel had six months for this purpose—and the invaluable benefit of watching the other seven defendants' trial. That preview of the evidence and strategy was worth many additional months of preparation time. Most of the defendants complain about the limiting instructions that the judge gave. They essentially wanted the judge to remind the jury incessantly that particular evidence might have value against one defendant but not others, or might have value contingent on a finding that the defendants were co-conspirators. See *United States v. Martinez de Ortiz*, 907 F.2d 629 (7th Cir. 1990) (en banc). Perhaps this could have been handled better, but too many reminders get irksome and jurors will tune them out. At the close of the case defense counsel did not ask for an instruction recapping the tasks of separation that the jurors needed to perform—but the arguments of counsel drove home the nature of the task. Each defendant's lawyer reminded the jurors (without contradiction from judge or

prosecutor) that guilt must be assessed individually, using only evidence about what that defendant did or said. We could go on, saying a few words about each remaining line of argument, but the trials were well handled by the district judge and it suffices to say that we have considered these arguments and find no abuse of discretion.

The only other contentions that require individual treatment are those based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Seven defendants were tried before *Apprendi*; Powers was tried afterward, and in his case the jury was asked to (and did) determine beyond a reasonable doubt whether the circumstances that raised the maximum punishment to life imprisonment had been established. That approach satisfied the due process clause, even though the indictment did not include all of the details that potentially affected the sentence. See *United States v. Cotton*, 122 S. Ct. 1781, 1785-87 (2002); *United States v. Smith*, No. 00-4184 (7th Cir. Oct. 16, 2002), slip op. 19-24. Providentially, the district judge asked the jury to return special verdicts, one for each predicate act, even in the pre-*Apprendi* trial. For six defendants these special verdicts show that the jury found, beyond a reasonable doubt, events that justify a punishment as high as life imprisonment. With respect to these six there is no *Apprendi* problem. With respect to Carl Warneke, however, a problem remains.

The maximum penalty following a RICO conviction depends on the maximum penalty for the most serious predicate offense. For Warneke, that offense was murder committed in Illinois. Illinois authorizes life imprisonment (or capital punishment) for killing with certain aggravated circumstances, such as "exceptionally brutal or heinous behavior indicative of wanton cruelty" or premeditated murder. See 730 ILCS §5/5-8-1(a)(1)(b). Lesser degrees of murder may have lower maximum sentences. The problem

lies in Predicate Act 20, which alleged that an Outlaw murdered Jack Castle in a drive-by shooting. Act 20 included two subparts: generic conspiracy to commit murder (Act 20A) and premeditated murder (Act 20B). The latter carries a life sentence; the former does not. The jury instructions did not call on the jurors to determine whether Act 20A or Act 20B (or both) had been committed; the special verdict referred to Act 20 as a unit. The prosecutor contended that Warneke, though not the shooter, had directed the murder and thus was accountable as a principal under Illinois law, but the jury did not find this explicitly.

But neither did the district court commit plain error in sentencing Warneke to life imprisonment. Because he did not make an *Apprendi*-like argument in the district court, and did not ask for a special verdict distinguishing Act 20A from Act 20B, only plain error could justify reversal now. See Fed. R. Crim. P. 52(b); *United States v. Bjorkman*, 270 F.3d 482 (7th Cir. 2001); *United States v. Nance*, 236 F.3d 820 (7th Cir. 2000). Plain error means error that not only is apparent in retrospect (as this error is) but also threatens an injustice—which this error did not. For although the jury did not *find* that Warneke was the brains behind this premeditated murder (one carried out by lying in wait), the record demonstrates this. Several witnesses testified in detail about this murder and Warneke's role in its planning. Warneke did not dispute the evidence that Castle's execution was carefully planned. Instead Warneke denied that he took part in that planning. *That* argument the jury considered, and rejected beyond a reasonable doubt, when it found that Warneke was responsible for Predicate Act 20. The important finding was made by the jury, on the right standard. So no injustice has been done; the error turns out to have been wholly formal.

Schneider has a distinct theory: because he bypassed the jury when pleading guilty, *no one* found *anything* beyond a reasonable doubt. We inquired at oral argument whether

Schneider wants to withdraw his plea and go to trial, on the rationale that he would not have pleaded guilty had he known that he was giving up the right to have the jury determine beyond a reasonable doubt those circumstances that fix his maximum punishment. Counsel answered no. By pleading guilty and assisting the prosecutor, Schneider reduced his punishment. The likely result of withdrawing the plea and going to trial would be a life sentence. What Schneider wants instead is to retain the benefit of the plea while avoiding any exposure to a penalty exceeding 20 years (the "minimum maximum" for every RICO conviction). This is not an available outcome. What actually happened certainly is not plain error (the standard for Schneider, as for Warneke, because no timely argument was made in the district court). The predicate acts to which Schneider *confessed* as part of his plea expose him to life imprisonment. Schneider certainly wasn't "denied his right to a jury trial," as his reply brief says; he *waived* his right to a jury trial. His own admissions resolved all important matters against him. An admission is even better than a jury's finding beyond a reasonable doubt; it removes all contest from the case. See *United States v. Broce*, 488 U.S. 563, 570 (1989).

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*