# In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-2660, 03-2707 & 03-3010

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*
*Cross-Appellant,*

v.

BRENDA J. CUMMINGS and DAVID S. MORRIS,

*Defendants-Appellants,*
*Cross-Appellees.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 719—**Joan B. Gottschall**, *Judge.*

———————

ARGUED SEPTEMBER 8, 2004—DECIDED JANUARY 13, 2005

———————

Before BAUER, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* A jury convicted Brenda Cummings and David Morris on two separate counts—count one, conspiracy to commit fraud using unauthorized access devices in violation of 18 U.S.C. § 1029(a)(2), and count two, conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). The district court *sua sponte* ordered a new trial for the defendants on the RICO count, but we reversed because the district court

did not have jurisdiction to order the new trial. On remand, the district court granted the defendants' motions for downward departure and imposed aggregate sentences without differentiating the punishment attributable to the respective counts. The defendants appeal their RICO convictions and also seek a remand for resentencing in light of *Blakely v. Washington*, 124 S. Ct. 2531 (2004), and *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004), *cert. granted*, 125 S. Ct. 11 (2004) (No. 04-104). The government cross-appeals the district court's downward departure in the defendants' sentences. We reverse the defendants' RICO conviction and remand for resentencing on the remaining count.

## I.  Background Facts

In the often high-stakes game of consumer finance, most debtors repay their creditors, and everyone is satisfied. Unfortunately, some debtors fail to make good on their financial obligations and then, to make matters worse, drop out of sight. At such times, creditors may turn to other players, such as collection agencies, which specialize in finding and collecting from debtors. Because some debtors are especially difficult to locate, collection agencies sometimes employ individuals known as "skip tracers," who specialize in finding such individuals.

Skip tracing is relatively uncomplicated. Collection agencies provide skip tracers with identifying information, such as debtors' names and social security numbers. The skip tracers then use their particular talents to discover the debtors' whereabouts. The skip tracers pass this information back to the collection agencies, which may then contact the debtors or their employers to attempt collection of the debt through garnishment of wages or otherwise. Much of this tracing information may be found in publicly accessible sources, but collection agencies often prefer to hire skip tracers because of the time and expense involved in doing it themselves.

The Illinois Department of Employment Security ("IDES") administers Illinois's unemployment insurance program, under which it collects premiums from employers and pays benefits to qualified individuals. Employers submit to the IDES quarterly reports containing their employees' names, social security numbers, and earnings information. The IDES maintains this confidential financial and employment information in a computer database. The database contains the very sort of information that is valuable to a skip tracer, and it is conveniently located in one place and easily retrievable by those with the proper computer access. Standing between this gold mine of information and prospecting skip tracers, however, are Illinois law and IDES policies, which protect the confidentiality of the information in the database and forbid its disclosure except for officially sanctioned purposes.

Although skip tracing is not necessarily illegal, some skip tracers stray across the line in their efforts to track down their quarry. David Morris was one such skip tracer. Morris started work at the IDES sometime in the 1970s, and then, in the late 1980s, Morris began working at Chicago's Department of Human Relations. From the early 1980s, however, Morris had been augmenting his salary by operating a skip tracing business on the side. By the early 1990s, his services were, by all accounts, highly sought after by collection agencies. But Morris owed a good portion of his success to certain associates working at the IDES. These associates—Brenda Cummings, James Duniver, and Jerry Harris—all had access to IDES computers and the wealth of tracing information stored therein. Morris approached each of these individuals separately and proposed to pay them in exchange for pulling up debtors' employment information from the database, and each agreed to the arrangement.

Despite having access to the IDES's computers, Morris's friends were relatively low-level employees in the IDES

hierarchy. For example, Cummings worked in the purchasing department of IDES. She played no role in administering unemployment compensation benefits, and thus her job duties did not require her to access the database frequently. Duniver was an IDES client service supervisor. In carrying out his duties, Duniver sometimes would be required to access the data, but he had no special responsibility to maintain the data or its confidentiality (beyond the general duty that all IDES employees shared to keep the information confidential). Harris was another client service supervisor, and, like Duniver, he only infrequently accessed the desired data as part of his duties. No evidence suggests that any of Morris's accomplices had any managerial or supervisory control over the IDES itself. It appears that Morris approached the three individuals because of his friendship with them and their ability to access the data, not because of any particular influence or authority they may have had in the IDES hierarchy.

The scheme was simple. Morris's collection agency clients provided him lists of debtors' names and social security numbers, and Morris passed the lists to Cummings, Duniver, and Harris. Each list contained about 30 to 35 debtors. Morris's accomplices entered the debtors' identifying information into the IDES computers and printed or copied down the confidential wage and employer data for listed debtors that happened to turn up in the IDES database. They passed the information on to Morris, who then supplied it back to the collection agencies.

Per their agreements, Morris paid his friends about $10 for each debtor list they processed, sometimes by check and sometimes by cash. Over the course of the scheme, Morris's friends racked up tidy sums for running thousands of computer inquiries and producing the desired information. From 1988 through 1993, Cummings earned at least $63,636, paid mostly by check, for the computer inquiries she ran for Morris. Harris opted for cash payments only and made at

least $3000 for his endeavors. Duniver took cash and check payments totaling about $2000. As for Morris, it is uncertain how much he profited under the arrangement, but his tax returns from 1987 to 1993 indicate $228,284 in skip tracing earnings, and he likely earned thousands more in unreported income.

The scheme ran smoothly until federal agents got wind of it in 1993 from a disgruntled former employee of one of the collection agencies. In early 2000, all four participants in the scheme were charged in a superseding indictment for conspiracy to defraud using multiple unauthorized access devices (debtors' social security numbers) to obtain something of value (the confidential earnings and employment information) in violation of 18 U.S.C. § 1029(a)(2). The defendants also were indicted for conspiring to engage in a pattern of racketeering activity consisting of multiple acts involving bribery and official misconduct in violation of RICO, 18 U.S.C. § 1962(d).

## II. Defendants' Trial and Post-Trial Proceedings

Duniver and Harris pled guilty to the first count (violation of § 1029(a)(2)) and agreed to cooperate with the government in its prosecution of Morris and Cummings. At the close of the government's case, Morris and Cummings made oral motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a), but the district court reserved ruling on the motions and submitted the case to the jury. On March 3, 2000, the jury returned guilty verdicts on both counts.

A long series of post-trial motions and rulings ensued for over a year, in which the district court repeatedly denied various defense motions for acquittal or for a new trial. Nevertheless, the district court continually expressed doubt

as to the defendants' guilt on the RICO charge and reluctance to sentence the defendants in accordance with the jury's verdict of guilty.

Finally, at a hearing on November 5, 2001, the district court announced that the conduct of the defendants was outside the "heartland" of RICO cases and *sua sponte* ordered a new trial on the RICO charge. The government appealed the order, and we reversed and remanded for sentencing because the district court did not have jurisdiction to order a new trial more than seventeen months after the return of the guilty verdict. *See United States v. Morris*, No. 01-4151, 40 Fed. Appx. 248, 2002 WL 1453408 (7th Cir. July 1, 2002). On remand, the defendants jointly filed a renewed Rule 29 motion for judgment of acquittal. The district court did not rule on this motion, but instead appointed additional counsel for Morris. Morris thereafter filed a motion to reconsider an earlier Rule 29 motion, and the district court denied Morris's motion. In so doing, the district court stated:

> Based on its research to date, albeit with little engagement on the merits by the government, the court is inclined to believe that defendant Morris (as well as defendant Cummings) is legally innocent of the RICO charge set forth in Count II of the indictment on which he was convicted. Specifically, there was no evidence that any of the coconspirators exercised any control or direction over the enterprise (or conspired to do so) or that anyone agreed to facilitate the activities of any person who exercised direction or control. Nor did the alleged coconspirators have any agreement or intent to affect the enterprise by means of the alleged acts.

Nevertheless, the district court observed that our remand order "bar[red] any further inquiry into the merits" because the court "had no power . . . to order a new trial." As a consequence, the district court concluded, "it must follow that [the court] cannot grant a judgment of acquittal."

On June 6, 2003, the district court at last proceeded to sentencing. The defendants moved for downward departure under the sentencing guidelines; the court granted the motions, again opining that the defendants' offenses were "outside the heartland of RICO." The court also concluded that Cummings "was not a typical RICO defendant" and that Morris's gain from the crime overstated its seriousness. The court imposed aggregate sentences on each defendant rather than specifying separate sentences for each of the two counts on which the defendants were convicted. In all, the court granted an eight-level downward departure to Cummings and sentenced her to a four-month prison term. The court granted a six-level downward departure to Morris and sentenced him to a twenty-one-month prison term.

On appeal, the defendants argue that there was insufficient evidence to support their convictions on the RICO count. The defendants do not, however, challenge their convictions on count one. They also seek a remand for resentencing in light of the *Blakely* and *Booker* decisions, which cast doubt on the constitutionality of the federal sentencing guidelines. The government cross-appeals the defendants' sentences, contending that the district court erred in departing downward.

### III. Discussion

Morris and Cummings argue that the evidence adduced at trial was insufficient to support their RICO convictions. Specifically, the defendants contend that the government failed to establish that anyone in the charged RICO conspiracy exercised the required level of direction over the enterprise as required by *Reves v. Ernst & Young*, 507 U.S. 170 (1993). The defendants also claim that the government failed to establish that the predicate acts committed by the defendants had the requisite nexus with the affairs of the charged enterprise.

We review a sufficiency of the evidence challenge by considering the evidence in the light most favorable to the government, deferring to the credibility determinations of the jury, and we overturn a verdict only when "the record contains no evidence, regardless of how it is weighed, upon which a rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Starks*, 309 F.3d 1017, 1021 (7th Cir. 2002); *see also United States v. Torres*, 191 F.3d 799, 807 (7th Cir. 1999). But the government contends that defendants did not timely raise the sufficiency of the evidence challenge before the district court and that we therefore must review the defendants' appeal under the plain error standard, which places an even greater burden on the defendants. Under this standard, we will reverse "only if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *United States v. Meadows*, 91 F.3d 851, 855 (7th Cir. 1996). The defendants respond that they properly preserved their challenge to the sufficiency of the evidence, but even if plain error review applies, the verdict cannot stand because the government's evidence failed to satisfy *Reves*.

Before turning to these arguments, a brief review of the relevant RICO provisions and caselaw is in order. The defendants were convicted under 18 U.S.C. § 1962(d) for conspiracy to violate § 1962(c). Section 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Thus, the basic elements of a § 1962(c) violation are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000).

The statutory language itself does not illuminate what it means "to conduct or participate." Nevertheless, Supreme Court precedent teaches that this language "indicates some degree of direction," *Reves*, 507 U.S. at 178, so that a person charged to have conducted or participated in the enterprise's affairs within the meaning of § 1962(c) must have had "some part in directing those affairs." *Id.* at 179; *see also Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998) ("[M]ere participation in the activities of the enterprise is insufficient; the defendant must participate in the operation or management of the enterprise."). Regarding persons outside the enterprise, the Court noted that "[a]n enterprise might be operated or managed by others associated with the enterprise who exert control over it as, for example, by bribery." 507 U.S. at 184 (internal quotes omitted).

Although *Reves* did not specifically address § 1962(d), its operation or management test is applicable in the conspiracy context. In *Brouwer*, we clarified that for a conspiracy to violate § 1962(d), the "agreement must be to knowingly facilitate the activities of the operators or managers to whom [§ 1962(c)] applies. . . . It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do." 199 F.3d at 967. Thus, in the conspiracy context, the *Reves* test clarifies that the person charged must "knowingly agree to perform services of a kind which facilitate the activities of those who are operating [or managing] the enterprise in an illegal manner." *Id.*; *see also Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 869-70 (7th Cir. 2001); *United States v. Swan*, 250 F.3d 495, 499 (7th Cir. 2001) ("[T]he jury need[ ] only to find that [the person charged] knowingly agreed to facilitate the activities of those operators or managers to whom § 1962(c) can apply. . . .").

In the present case, the IDES was the charged RICO enterprise. The prosecution's theory was that the defendants conspired to participate in the conduct of the IDES's affairs

through a pattern of racketeering activity. The charged racketeering activity was bribery—Morris paid Cummings and the others in exchange for the confidential information contained in the IDES database. The defendants candidly concede that their scheme likely violated state bribery and official misconduct laws as well as IDES policies. But defendants argue that the government failed to show that any of the scheme's participants directed or managed the enterprise as *Reves* requires, and thus the evidence cannot support their convictions on the RICO count.

We agree. Regardless of which standard of review applies, the record is devoid of evidence that the defendants conspired knowingly to facilitate the activities of anyone to whom § 1962(c) would apply—namely, an operator or manager of the IDES, the charged RICO enterprise. *Cf. United States v. Warneke*, 310 F.3d 542, 547 (7th Cir. 2002) (noting that a defendant may violate § 1962(d) by "join[ing] forces with someone *else* who manages or operates the enterprise.") (emphasis in original). In this regard, none of Morris's accomplices fits the bill. True, Duniver and Harris held customer service "supervisor" positions at the IDES, but nothing in the record explains the scope of their duties or the relevance of their duty titles to the RICO conspiracy with which Morris and Cummings were charged. Likewise, Cummings held a minor position in the IDES's purchasing department, and no evidence indicates that she held any position by which it may be said that she operated or managed the IDES. No evidence indicates that any of these defendants was an operator or manager of the IDES, whether by official duty position or by means of some de facto control over the agency's affairs. *Cf. Warneke*, 310 F.3d at 548 ("*Reves* and *Swan* hold that to violate RICO the person [conducting the enterprise's affairs] must have a real operational (or managerial) role . . . ."). Certainly, nothing in the record provides any basis for the jury to have concluded that Morris's associates met the *Reves* operation or

management test or that Morris and Cummings conspired to facilitate the activities of anyone else who might meet that test.

Notwithstanding this evidentiary shortcoming, the government also tries to characterize Morris—an outsider—as the enterprise's operator or manager. After all, *Reves* envisioned that an enterprise may be operated or managed by an outsider who "exert[s] control over it as, for example, by bribery." 507 U.S. at 184. Moreover, a lower level defendant "may conspire to violate § 1962(c) even if that defendant could not be characterized as an operator or manager of a RICO enterprise under *Reves*." *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 979 (7th Cir. 1995). Thus, the government contends that Morris's bribery of the IDES employees satisfies *Reves* because the employees' acceptance of bribes amounted to their agreement to facilitate Morris's control of the enterprise. Even though there is no evidence that Morris exercised control over the IDES, the government explains that "an outsider who bribes a public official rarely, if ever, obtains full control of the government agency in question; rather, the purpose of the bribe is to affect the exercise of a particular function of the agency in a particular situation." (Gov't Br. at 26.)

While we cannot fault this proposition as it applies to bribery generally, the government's argument is inapplicable in the RICO context. No evidence adduced at trial reveals that Morris conspired to operate or manage the affairs of the IDES through the bribery of his IDES associates. The undisputed purpose of Morris's bribes reinforces this conclusion. Morris bribed his friends at the IDES in return for confidential information to be used in his skip tracing business. He did not pay bribes in order to exert control over the IDES's core functions of collecting insurance premiums and paying of unemployment benefits. This would be an entirely different ball game if, for example, Morris had bribed his accomplices to make payments of unemployment

benefits to unqualified recipients or to falsify payment of premiums by employers. In these hypothetical situations, the bribery schemes at issue would look more like a prototypical RICO conspiracy, in which low-level government employees are bribed to facilitate an outsider's illegal control over the enterprise. *See*, *e.g.*, *United States v. Conn*, 769 F.2d 420 (7th Cir. 1985) (affirming RICO conviction of a traffic court clerk who accepted bribes to influence the disposition of traffic cases).

Despite this fundamental flaw in its RICO case, the government maintains that Morris's repeated bribes of Cummings, Harris, and Duniver allowed Morris to "control their performance of a particular aspect of their jobs—namely, their ability to control the confidentiality of the [IDES] information. . . ." (Gov't Br. at 27.) This assertion begs the question because it sidesteps the substance of the *Reves* test altogether. It assumes that Morris operated or managed the IDES by exercising control over a particular aspect of his accomplices' jobs—"their duty to maintain the confidentiality of the information." Moreover, it assumes that when Cummings and the others took time out from performing their official duties in order to run Morris's inquiries, they necessarily agreed to facilitate Morris's control over the enterprise.

At most, however, the evidence shows that Morris "controlled" his *accomplices* to the extent they took time out of any given workday to run computer inquiries. The evidence does indicate that Cummings, Duniver, and Harris spent several hours on some workdays running database inquiries for Morris. But at most this fact indicates the degree to which Morris operated or managed his accomplices, not how much (or whether) Morris controlled IDES with respect to the agency's function of collecting premiums and paying benefits. In short, no evidence shows that Morris somehow operated or managed IDES itself or conspired to do so, and bribery alone cannot substitute for *Reves*'s operation or

management requirement. *Cf. Reves*, 507 U.S. at 185 ("[T]o conduct or participate . . . in the conduct of such enterprise's affairs, . . . one must participate in the operation or management of the enterprise itself.") (internal quotations omitted); *accord United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998) ("[T]he commission of crimes by lower level employees of a RICO enterprise may be found to indicate . . . operation or management but does not compel such a finding[,]" thus the existence of a bribery scheme does not necessarily render the employees liable under RICO.).

The government's theory would transform all garden-variety bribery into RICO violations, irrespective of whether anyone in the scheme satisfied *Reves*. It is true that lower-level participants in an enterprise may violate RICO if it can be shown that they have "facilitate[d] the activities of those who are operating the enterprise in an illegal manner[,]" *Brouwer*, 199 F.3d at 967, through bribery or otherwise. *See Reves*, 507 U.S. at 184. The fundamental question remains whether Morris or the others operated or managed the IDES's affairs through bribery. The answer, on the evidence contained in the record, is no. Thus, it does not matter whether, as the government contends, the bribery scheme deprived the IDES of the "honest services" of three of its employees or that the scheme ran contrary to the IDES's policies designed to keep the information in its database confidential. As with virtually all government bribery schemes, this one was not without harm, cost, or consequence to the agency employing those bribed. Certainly any bribe of a government employee can be said to deprive the government of some degree of honest services, which is one of the reasons why the law forbids bribery in the first place. But a bribery scheme alone does not amount to a RICO conspiracy unless it satisfies specific additional requirements, and it is evident that the bribery scheme in this case, on the evidence adduced at trial, does not do so.

In sum, the government failed to show that the defendants satisfied the *Reves* operation or management test, and thus we conclude that there is insufficient evidence to support the RICO convictions of Morris and Cummings under § 1962(d), notwithstanding ample evidence of likely violations of various state bribery and official misconduct laws. We might conclude differently if, for example, the government had charged Morris's skip tracing business as the RICO enterprise. Then the operation or management test would be satisfied and there might well be sufficient evidence to support a RICO conspiracy conviction. The government instead charged IDES as the RICO enterprise, so we reach the conclusion we do today—at most, the defendants' scheme amounted to bribery, not a RICO conviction.

For the reasons given, we reverse defendants' conviction on count two. Because there is insufficient evidence to support the defendants' RICO conviction, we need not address the parties' remaining RICO arguments or whether the district court's downward departure with regard to the RICO convictions was appropriate. One remaining wrinkle, however, is the fact that the district court without explanation imposed aggregate sentences for the two separate counts on which the defendants were convicted. It therefore is unclear whether, for example, the district court agreed with the government's recommendation that the two counts should be grouped as closely related counts under U.S.S.G. § 3D1.2(a), or whether the district court imposed separate terms of imprisonment to be served concurrently. Under U.S.S.G. § 5G1.2, it appears that the district court should have imposed separate sentences on each count, to be served concurrently. *See United States v. De la Torre*, 327 F.3d 605, 609 (7th Cir. 2003). In any event, it is unclear what sentence the district court imposed as to the remaining count of conviction, which the defendants do not challenge. We therefore remand the case to the district court for resentencing on count one in accordance with the Supreme Court's latest

pronouncement on the effect, if any, of *Blakely* and *Booker* on the federal sentencing guidelines.

## IV. Conclusion

For the reasons given, we REVERSE the defendants' RICO convictions and REMAND the case for resentencing on count one.

A true Copy:

      Teste:

                           _____

                           *Clerk of the United States Court of*
                               *Appeals for the Seventh Circuit*